BOND *v.* SMITH.

1. WITNESSES—MATTERS EQUALLY WITHIN KNOWLEDGE OF DECEASED
   —CLAIMANT UNDER CONTRACT FOR CARE AND NURSING SERVICE.

   Plaintiff, claimant against estate of deceased, under claimed
   contract for care and nursing attention to decedent for the
   rest of his life, in return for his promise to give her all of
   his property remaining at the time of his death, was barred
   from testifying as to matters equally within the knowledge
   of deceased (CL 1948, § 617.65).

2. SPECIFIC PERFORMANCE—EVIDENCE—CONTRACT TO LEAVE PROPERTY
   BY WILL.

   The fact that deceased gave plaintiff $1,000 on the day
   he made a proposed will leaving her the residue of his estate
   is not to be considered as disputing the fact of her claimed
   3-year-old agreement with him of which she sought specific
   performance whereby in return for care and nursing attention
   in her own home for the rest of his life, deceased had agreed
   to leave her the balance of his property upon death.

3. SAME—CONTRACT TO LEAVE PROPERTY BY WILL—EVIDENCE.

   Evidence presented in suit for specific performance of deceased's
   contract to leave plaintiff all of his property remaining at
   his death in return for her care and nursing service *held*, clear
   and convincing as to its existence, and to have entitled plain-
   tiff to relief, where it appears that plaintiff, a nurse, had
   taken him into her own home and, although it does not ap-
   pear she was related to him, treated him as a member of the
   family for a period of nearly 3 years and that he had signed
   an invalid will which he had dictated and reciting there was
   an agreement with plaintiff as to giving him "nursing care
   for the rest of my life" and naming her as residuary legatee
   and executrix of his estate.

Appeal from Kalamazoo; Sweet (Lucien F.), J.
Submitted October 5, 1954.   (Docket No. 18, Calen-

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Witnesses § 251.
[2, 3] 57 Am Jur, Wills §§ 192, 198, 202.
[2, 3] Decedent's agreement to devise, bequeath, or leave property
   as compensation for services. 69 ALR 14, 53; 106 ALR 742, 748.

dar No. 46,258.)   Decided November 29, 1954.   Rehearing denied January 12, 1955.

Bill by Wilhelmina Bond against Harry Smith, administrator, and others, as heirs, legatees and devisees of Richard Van Bochove, deceased, for specific performance of contract, or in the alternative damages for breach thereof.   Decree for defendants. Plaintiff appeals.   Reversed and decree ordered entered.

*Fox, Fox & Thompson* (*Edward P. Thompson,* of counsel), for plaintiff.

*Smith & Bauckham* (*John H. Bauckham,* of counsel), for defendants.

REID, J.   Plaintiff filed a bill for the specific performance of a contract between herself and decedent Richard Van Bochove, by which contract decedent promised to give to plaintiff all of his property remaining at the time of his death, in consideration of her agreement to care for and give nursing attention to the decedent for the rest of his life.   As an alternative, plaintiff prayed that she be awarded compensation for breach of such contract and it is the award of compensation for the breach rather than specific performance that plaintiff accentuates on this appeal, and plaintiff requests that she be granted a claim against the estate equal to the sum of the estate.

Defendants, the administrator of the estate and the heirs-at-law of the decedent, deny the existence of the contract and deny that plaintiff is entitled to the relief which she seeks.

There was no dispute upon the hearing over the principle of law that plaintiff is barred by the statute from testifying as to matters equally within the

knowledge of the deceased and she was not permitted.to give testimony as a witness as to matters equally within the knowledge of decedent.*

Decedent had lived (as a widower) several years in his own residence in the city of Grand Rapids. His house was very filthy and ill smelling. He suffered a personal injury (broken hip) that necessitated his being taken care of first at the Butterworth hospital (for about 3 weeks) and afterwards at the Verdries nursing home. Decedent was paying $35 a week for his care there at the Verdries nursing home where apparently he was received April 15, 1949, and which he left, June 9, 1949.

Mrs. Bond, plaintiff, was a nurse at the Verdries nursing home. Her regular salary was $30 a week, with some possible overtime which might have run up to $39 a week. Decedent was dissatisfied with the food he was receiving at the nursing home. While there he had been semiambulatory, in the language of the witness who operated the nursing home.

Decedent asked Mrs. Bond, the plaintiff, if she would take him to her home, out of the nursing home, and it was agreed among other things that he should come to plaintiff's home and be cared for there for the rest of his life. Accordingly, on June 9, 1949, he left the Verdries nursing home and went to live at the residence of Mr. and Mrs. Bond, where he stayed thereafter until his death, April 26, 1952. During the time that he lived at the Bond residence, the Bonds took him with them on trips to Houghton lake, also to Pine lake, also on several trips to Florida, for which latter trips decedent paid the expense. Without the presence of Mrs. Bond and some of her family, he would not have been able to go to Florida.

It is admitted that the care given decedent by Mrs. Bond and her family was very good. The members

* See CL 1948, § 617.65 (Stat Ann § 27.914).—REPORTER.

of the Bond family were very good to him, called him Uncle Dick, and whenever he desired anything gotten from downtown they would go and get the article for him. He could hardly walk; he was given the best bedroom in the house all to himself; he was bathed thoroughly every day and powdered. Plaintiff was required to apply liniments to him because he had aches and pains; he had meals and lunches whenever he wanted them; he was not confined to his room and was treated as a member of the family. Plaintiff's daughter testified, "He always came to the table; he said the grace at the table; he took over the head of the table, and everyone applied to his wishes when he wanted things done." On the trips to Florida with the plaintiff's family, they traveled in an automobile with a trailer and on arrival in Florida they rented a cabin and situated the trailer next to the cabin. Wherever the Bond family went, he always went with them. He went to Florida 3 winters. He sometimes referred to plaintiff as mother, being the mother of the household, sometimes Billie or Wilhelmina. His attitude toward her in general was that there was no one in the world like plaintiff.

Neighbors of Mr. Van Bochove, decedent, in Grand Rapids testified that the nephews and nieces of decedent were very seldom seen by those neighbors to visit their uncle, decedent.

Viola Yenior, a friend of plaintiff, but not interested in the matters in dispute, among other things, testified that she had known plaintiff for 9 or 10 years and that she and her husband are frequent visitors in the home of plaintiff and her husband, that she had seen the decedent frequently in plaintiff's residence. She further testified to the excellent care there received by decedent, Richard Van Bochove. Mrs. Yenior further testified:

"*Q.* Did he [decedent] ever speak to you about the kind of care he got before he came to live with the Bonds?

"*A.* Yes, he said if they hadn't taken him into their home, he wouldn't be there today to enjoy the comfort they were giving him.

"He spoke of rewarding Mrs. Bond several times. I remember one time he was at Pine lake and I believe Patricia [daughter of plaintiff] remarked about it when he had messed his bed. He was crying and it was just around meal time and Billie [plaintiff] went in to take care of him; I went in and I helped to change the bedding; he was crying, and she said, 'Never mind, Uncle Dick, some day maybe somebody will be doing this for me.' He says, 'You will be well rewarded. Whatever I have left will be yours.' * * *

"*Q.* What did she say to Mr. Van Bochove—would the reporter read the last question?"

[The question that was apparently read to the witness is "*Q.* Mrs. Yenior, did you ever hear Mrs. Bond say anything to him about whether or not she would continue to care for him?"]

"*A.* Yes, she said she would take care of him all the rest of his life."

The daughter Patricia testified, among other things:

"It was the second summer he was with us. * * * He was having a little trouble and he got his bedclothes dirty and mother had to change him and bathe him and clean his bedroom up a little bit. I remember he was crying because he felt bad for what he had done. He says, 'Wilhelmina, I will always remember you for this. When I die you will have everything I leave.' Mother did not work outside the home when he was staying with us. She was with him constantly."

John Locke, a disinterested witness, who at the time of the hearing was a tenant in the house in Grand Rapids owned by decedent, testified:

"*Q.* Now in your presence did Mr. Van Bochove ever say anything about the care he was receiving?

"*A.* Yes, he made one remark that was finally he had somebody to take care of him for the rest of his life. That was while he and I were in the living room together."

Paul Bond, husband of plaintiff, testified deceased said:

"You and your wife will not be sorry as this is going to be your home."

This conversation occurred when they were renovating and cleaning up the house of decedent in Grand Rapids.

Douglas Miller, son-in-law of plaintiff, testified decedent had asked Mrs. Bond if she would take him into her house out of the nursing home, that he wasn't getting proper care that he thought he should be getting and she took him out and took him to their home. He also testified that decedent would tell him of his oldtime past experiences and what wonderful care Mrs. Bond had given him, took him out of the nursing home that he was in.

On April 24, 1952, decedent gave plaintiff a check as follows:

"Old Kent Bank

"Grand Rapids, Mich. April 24, 1952 No. 1

"Pay to the
  Order of          W. Bond          $1,000.00
"One Thousand ...... ............ Dollars
"For Care                    R. Van Bochove
"Endorsed: W. Bond"

After the giving of the check and on the same day, a draft of a proposed will was made. The daughter Patricia testified that on that day, Thursday afternoon, she was called home from school, Uncle Dick wanted to see her. When she got home Uncle Dick was sitting at the kitchen table on the end and her

mother, plaintiff, was sitting on his left side, and had a blank paper before her. Patricia testified:

"I sat down and I listened to him and he dictated this whole memo to my mother and while he was dictating it she in turn wrote it down on the paper, and as he got all through he wanted her to read the paper back to him, and after she finished writing this she read the paper back to him, and then he wanted the phrase put in there where he had left his entire estate to mother why he had left it to her so his relatives would know why he was leaving this money to her. * * * There is no doubt in my mind that that is the paper he dictated to mother and he signed exactly as he dictated it [referring to plaintiff's exhibit No 1]. * * * He said when he finished leaving—or, rather, having mother write what he wanted to bequeath to each of his relatives, mother said, 'Dick, do you think they will be satisfied with this, with such a small amount?' And Uncle Dick said, 'If they are not satisfied with what I give them, they don't need anything.' * * * He wanted the words put in there, the reason for leaving the remainder of his estate to mother, to be sure and be put in there so his relatives would understand why. The terms he asked to be put in there were for mother's loving care and faithful nursing in time of need."

She further testified to the visit of attorney Fox upon this occasion and that Mr. Fox, decedent's attorney and decedent, went into decedent's room. She further testified:

"Mr. Fox came out immediately. Mr. Van Bochove said to Mr. Fox in my presence that he wanted him to read this memorandum over that he had had mother write for him and he had signed, and to see if it was worded correctly, and he wanted him in turn to draw up a legal will and to bring it to the house so he could sign it. He told him what his main purpose

was for writing his will, that he wanted his estate to be left to mother."

The draft of the will provided for a total of $3,500 in bequests to his nephews and nieces, including 2 nieces of his deceased wife, and further provided:

"All the rest, residue and remainder of my estate both real or personal or mixed of whatever nature which I may own or have Including above legacies which may have lapsed by Beneficiary having met death before me. I give, devise and bequeath, to Wilhelmina Cornelia Bond my faithful nurse, friend, and caretaker, for all the kind and loving care in my time of need she has bestowed upon me. For all the comforts of her home and agreement to give me nursing care for the rest of my life.

"13th I hereby nominate and appoint Wilhelmina Cornelia Bond as executrix of this my last will and testament.

"Thursday April–23–1952

"Mr. Richard Van Bochove"

After the draft of the will had been handed to Mr. Fox and some time during the next day, April 25th, the decedent was taken with a sudden stroke, lost consciousness, was taken to the hospital and died, April 26th, leaving no duly witnessed will.

Decedent was receiving an annuity of $125 or $150 per month. His estate consisted of a house inventoried at $10,000 and stock and personal property inventoried at $3,434.09.

Defendants argue that the depletion of the decedent's bank account in an amount in excess of $19,-900 during the period of not quite 3 years that he lived in plaintiff's home militates against the equities of plaintiff's claim and in effect would charge the depletion against plaintiff. It appears that while the decedent's bank account in the Old Kent Bank stood at nearly $30,000 in November and December, 1945, it was down to $19,062.35 on June 8,

1949, the day before he went to live with the plaintiff. Under the record, there is nothing to indicate that the Bonds had any knowledge of or anything to do with the depletion of decedent's bank account between December, 1945, and June 9, 1949. He had received as an inheritance between $50,000 and $60,000 when Mrs. John R. Van Bochove died in 1946 or 1947. Decedent apparently was just as spendthrifty before he came to live with the Bonds and spent his money just as freely or more freely before than he did after he came to live with them. He bet on horse races; that was his hobby. A nephew testified, "He was quite a horse man." There is testimony that he gave a brother, Garrett Van Bochove, $5,100, while he was living at Bonds. There is nothing to show that plaintiff or her family assumed to dictate as to where or with whom he should spend his money. He was not confined in plaintiff's house. The testimony does not bear out any assumption or proposition that decedent spent more money in the upkeep of the table or of the plaintiff or her family than ordinary board would have required without considering the personal care that plaintiff gave decedent.

Defendants also argue that the giving of the $1,000 check is highly inconsistent with the plaintiff's theory and claim in this case. We do not so regard the matter of the $1,000 check. Careful examination of it in its brief wording shows that the check did not purport to be "in full" or in "full payment" but simply says "for care," and the fact that upon the same day, April 24, 1952, he gave the check, he proceeded further to dictate the terms of the proposed will which he ordered Mr. Fox to draw, that would give plaintiff the balance of the estate after the payment of $3,500 in legacies to the nephews and nieces of himself or of his deceased wife, shows beyond doubt that the decedent did not regard the giving of the $1,000 check as a payment in full to Mrs. Bond,

but rather as a well-earned advancement toward the full payment set up in the proposed will.

Plaintiff's witnesses give clear and convincing testimony of the making of the contract on which plaintiff relies. It must not be overlooked that the dictated though unexecuted will did not give to plaintiff the entire estate that he had on hand at the time of his death but, if executed, would have given her the residue of the estate after the deduction of $3,500 to nephews and nieces of decedent and 2 nieces of his wife. Nor should we overlook the fact that decedent dictated this very will to plaintiff and plaintiff took down the notes of his dictation and apparently without making any protest that it was giving her $3,500 less than the agreement between them would give her, she consented to the reading back to the decedent of the dictated terms and she did not in anywise protest to decedent or apparently to any person that she was receiving less than her contract. Why did she not object? She was the nurse taking care of him. He was counting upon her to carry out his determination and wishes. From the conversation that she did have with him, she seemed herself to desire that the nephews and nieces should receive something of his estate. Her desire that the will should express his reasons for giving her the residue should be considered as indicating that she wished that the nephews and nieces be placated and be satisfied; that might save her the expense of a litigation with his heirs-at-law over his will. She did not violate the confidence and trust imposed in her as a nurse. Her want of objection to the inclusion of the legacies indicated in the draft of the proposed will, is not to be considered as disputing the fact of the existence of the agreement claimed by her. That agreement is indicated, though not fully expressed, in the proposed draft of the will, where he says:

"For all the comforts of her home and *agreement* to give me nursing care for the rest of my life." (Italics supplied.)

This, it is to be noted, is over the signature of the decedent. We have it, therefore, over his signature that there was an *agreement* between them on the subject of plaintiff's care for him and it is plainly to be inferred that the devise and bequest to plaintiff was to carry out his part of the agreement. We conclude that the proof of the existence of the agreement claimed by plaintiff is not only barely sufficient but should be considered as clear and convincing.

In a case somewhat similar, *Coull* v. *Piatt,* 337 Mich 334, we say at page 341:

"We believe there is sufficient testimony to show not only the consideration but also the agreement."

See, also, *Woods* v. *Johnson,* 266 Mich 172.

The most excellent care afforded the decedent and his eminent satisfaction with his home-like surroundings in the home of plaintiff, are highly corroborative of the testimony showing the existence of the contract. The testimony as to the existence of the contract is highly corroborated by circumstances. We are convinced of the actuality of the contract claimed by plaintiff.

Plaintiff having in full measure performed her part of the agreement is entitled to compensation for deceased's failure to perform his part.

The decree appealed from is reversed. Plaintiff may have a decree of this Court decreeing that she receive the residue of the estate after payment of allowed claims and administration expenses. Costs to plaintiff.

CARR, BUSHNELL, SHARPE, BOYLES, DETHMERS, and KELLY, JJ., concurred with REID, J.

BUTZEL, C. J., concurred in the result.